[Civ. No. 4193.   Third Appellate District.—March 16, 1931.]

CATHERINE STOCKEL, Respondent, v. MATT ELICH et al., Defendants; E. W. HAIGHT et al., Interveners and Appellants.

H. C. Nelson for Appellants.

E. S. Mitchell for Respondent.

MR. JUSTICE THOMPSON (R. L.) DELIVERED THE OPINION OF THE COURT.—This is an appeal on the part of the interveners from that portion of a judgment in favor of plaintiff which declares that the defendant Elich was the owner of $1493.36, the proceeds of the sale of 2,000 ties, and that plaintiff's attachment on said proceeds is valid.

For several years the interveners had been financing the defendant Elich in the manufacturing and sale of ties. The defendant Elich owned 40 acres of timber land in Humboldt County upon which he had been manufacturing ties. Elich was indebted to the interveners in the sum of $3,908.91 on account of ties previously manufactured on the said 40-acre tract. By a deed of conveyance duly executed and recorded June 4, 1928, Elich and his wife transferred to the interveners "all timber of every kind and character" which was situated on that tract of land. On that date, and as a part of the same transaction, Elich and the interveners executed a written contract authorizing Elich to enter upon the premises and cut and manufacture into ties the timber situated thereon. This contract recited that the foregoing deed of conveyance was executed as "security for the payment of the said sum of $3,908.91", together with such other sums of money as were advanced for the manufacturing of ties. The contract further provides that "all timber products manufactured from timber situated upon above described premises shall be sold or disposed of only through said first parties [interveners]; that the net proceeds received from the sale of any of the timber products from said premises shall be applied to the payment of the above-mentioned sums; . . . that this agreement shall terminate when the said sum of $3,908.91 and the interest thereon, together with such other sums as may be advanced by first parties shall have been fully paid". It was then provided that when such sums had been fully repaid, the grantees would reconvey the property to Elich.

Lawrence L. Chapman was the owner of 80 acres of timber land in the vicinity of the above-mentioned tract. The defendant Elich had been manufacturing ties on this last-mentioned land. May 3, 1928, this 80-acre tract of land was conveyed from Chapman and wife to Haight and Mitchell. On June 4, 1928, another contract for the sale of land and the manufacturing of ties from timber on this

80-acre tract was executed by Elich and the interveners. This contract provided for sale of the 80-acre tract to Elich for the sum of $5,500 and seven per cent interest thereon, together with all money advanced by the interveners for the cost of manufacturing ties from the timber thereon. The contract further provides: "The party of the second part [Elich] shall cut, manufacture and remove the products with due diligence and . . . the said products shall only be sold through the parties of the first part [interveners]; . . . that the net proceeds from the sale of all timber products from above lands shall be applied to the payment of the full purchase price as stated above, together with interest thereon and all other sums advanced," for manufacturing ties. It was then provided that upon payment of all said sums of money, the interveners would convey said 80-acre tract of land to Elich.

Pursuant to these agreements the defendant Elich entered upon the above-mentioned tracts of land and manufactured ties. Up to the time of the transaction which is involved in this action, all ties were sold by the interveners in their own names. The proceeds of such sales were remitted to them and applied pursuant to the terms of the foregoing contracts. Mr. Haight, who personally attended to these transactions, was going away for a temporary visit. He left on April 28, 1928. Prior to this he wrote to Elich telling him of the prospective trip and asking him to make a shipment of ties to the Southern Pacific Company. During the month of June, in the absence of Haight, Mr. Elich shipped to the Southern Pacific Company, in his own name, 3,000 ties. One thousand of these ties belonged to another party by the name of Flickenstein. Two thousand of these ties came from the premises covered by the above-mentioned deeds and contracts. While the proceeds of the sale of these 2,000 ties, amounting to the sum of $1,493.36, remained in the possession of the Southern Pacific Company, the plaintiff brought a suit in *assumpsit* against Elich based on another claim and thereupon attached the said sum of money. A third-party claim to this sum of money was duly served upon the Southern Pacific Company by Haight and Mitchell. Upon proceedings duly had a complaint in intervention was filed in the last-mentioned suit, in . which pleading Haight and Mitchell claimed to be the owners and

entitled to said 2,000 ties and the proceeds of sale thereof. Upon trial of the cause the court held that the interveners were not owners or entitled to the proceeds of sale of the 2,000 ties; that the attachment on said sum of money was valid, and thereupon rendered judgment for the plaintiff for the sum of $1493.36.

It seems quite evident from a construction of the foregoing deeds and contracts that the interveners held a lien upon the property, including the ties manufactured thereon, in trust for the payment of the several specified sums of money, together with all additional sums advanced to Elich for the cost of manufacturing the timber into ties. Mr. Elich testified in this regard: "Q. Now this stuff that was shipped out, who was the bill of lading sent to? A. To Mr. Haight and Mitchell. Q. And to whom was the money paid? A. Mr. Haight and Mitchell. Q. No matter whether they placed the order or you placed the order, as a matter of selling it, the proceeds went to Haight and Mitchell? A. Yes. Q. Who did the money belong to? A. Them. . . . Q. Now those ties that were shipped, two thousand, I believe, came off out of the camp you were working? A. Yes sir. Q. Had you . . . paid up Haight and Mitchell everything that was owing them for money that they had advanced in those operations of yours? A. No sir. Q. And to whom was the proceeds from the sale of the two thousand ties that came off your claim, to be paid, who was to get the money for them? A. Mr. Mitchell and Haight. Q. Haight and Mitchell? A. Yes sir. Q. The bills of lading were sent down to them? A. Yes. . . . Q. Were any of the ties, the two thousand ties that were shipped in June, taken off the Chapman timber? A. Yes sir. Well I am not sure, between five and six hundred ties. . . . Q. Did any of these ties come off of land to which the Stockels claimed ownership? A. No sir. Q. No question about that, is there? A. No sir. . . . Q. Now with reference to any ties that were on the ground out there at the time these agreements were drawn up on June 4, 1928, what arrangement if any did you have with Haight, with respect to such ties? A. No arrangements made of any kind. They bought whatever there was on the ground before we made out the agreement. They paid for everything and it was not specified in the agreement; just our understanding, be-

tween me and Mr. Haight that everything there was . . . in the camp would belong to them. Q. They had paid for it all before? A. Yes sir. . . . Q. Who is entitled to the money from the two thousand ties from your camp? A. Mr. Haight and Mitchell.'' The foregoing testimony is uncontradicted.

The respondent asserts that the foregoing instruments constitute mere mortgages upon the real property described in the deeds, and that the liens created thereby were forfeited and lost to the interveners when the timber was cut and manufactured into ties. (*Halleck* v. *Mixer,* 16 Cal. 574; *Herriter* v. *Porter,* 23 Cal. 385; *Moisant* v. *McPhee,* 92 Cal. 76 [28 Pac. 46]; 17 Cal. Jur. 735, sec. 41.) It is claimed that since the real owner of the land was lawfully in possession, when he cut the standing timber and manufactured it into ties, he thereby converted the timber into personal property, destroyed the interveners' lien thereon and became the owner of the ties. (17 Cal. Jur. 869, sec. 157.)     It is true that a deed which is absolute on its face, but which is intended merely to secure an indebtedness of the grantor, is a mortgage and does not actually convey title to the land. (*Moisant* v. *McPhee, supra.*) It is also true that a mortgage is merely a written contract hypothecating specific property and creating a lien for the security of a debt. (Sec. 2920, Civ. Code; 17 Cal. Jur. 696, sec 5; *Pacific Fruit Exchange* v. *Duke,* 103 Cal. App. 340 [284 Pac. 729].) A mortgage is not necessarily a grant of real property. (*Adler* v. *Sargent,* 109 Cal. 42, 49 [41 Pac. 799].) In the case of *Halleck* v. *Mixer, supra,* Mr. Justice Field says: ''Whilst the timber is growing it is a part of the realty . . . When once cut, the character of the property is changed; it has ceased to be a part of the realty and has become personalty, but its title is not changed. It belongs to the owner of the land as much afterwards as previously, and he may pursue it in whosoever hands it goes.''

The foregoing language is used in a case involving the title to timber which had been cut from land without any contract with relation thereto. In the case of *Herriter* v. *Porter, supra,* it is said: ''It is urged by the appellants, that the timber out of which the posts were made was cut on the land of Hihn and others—therefore, the posts were their property under the rule laid down in the case of *Hal-*

*leck* v. *Mixer, supra*. That is true, *unless they were cut under some contract* or agreement with the owners of the land, or with their consent—a fact which does not appear in the statement of facts agreed on.''

In the case of *Moisant* v. *McPhee, supra,* the facts differ from those of the present case. In that case the title to land was conveyed to McPhee and Markle to secure the payment of a debt due from the owner, Warren, to the grantees. By consent, the owner Warren cut from the premises a quantity of tan bark. There was no agreement that this bark was to be sold by the grantees. Warren sold it to the plaintiff Moisant for $1404. The grantee McPhee, however, appropriated the bark ''and converted it to his own use''. The court thereby properly held that under such circumstances the real owner of the land held title to the bark and had a right to sell it. Judgment was rendered accordingly. It must be remembered that the tan bark in the Moisant case was not cut pursuant to contract between the real owner of the land and the grantees upon terms which retained the absolute control of the commodity in the hands of the grantee. The present case differs from the Moisant case in that regard. The present case comes within the suggestion quoted from the Herriter case, *supra.*

Assuming that the interveners in the present case merely held title to the two parcels of land in trust to secure the payment of certain specified sums, and that the deeds of conveyance were mere mortgages, still Elich acquired no title to the manufactured ties, for he cut them under a specific contract which entitled the interveners to the proceeds therefrom. Even though Elich be conceded to be the real owner of the land, he does not claim any title to the ties. He frankly admits they belonged to the interveners. The two deeds and the accompanying contracts must be construed together to determine the right to the proceeds from the sale of the ties. The ties were not cut by the owner with a claim of title thereto. They were cut pursuant to the terms of the contracts which became a part of the instruments of conveyance of title to the land, which the law construes to be mere mortgages. The contracts were then a part of the terms and conditions of the mortgage. These instruments created a lien upon both the standing timber and the manufactured ties. By the terms

of these contracts the title to the proceeds from the sale of ties was retained by the interveners. Moreover, it does not appear that Elich ever did own the Chapman 80-acre tract from which at least 500 of the ties in controversy were cut. Certainly Elich could acquire no title to ties cut from this tract under any circumstances. He claims no such right or title.

Assuming that the deeds alone were mere mortgages and that severance of the timber from the freehold removed the lien upon the realty (17 Cal. Jur. 869, sec. 157), still a lien upon the ties which were manufactured from the timber was retained by virtue of the terms of the contracts accompanying the deeds. This was the evident intent of the contracting parties. Nor is the lien lost by virtue of converting the timber into ties. Section 2972 of the Civil Code provides: "The lien of a mortgage on a growing crop continues on the crop after severance, whether remaining in its original state or converted into another product, so long as the same remains on the land of mortgagor."

Evidently the combined instruments which were executed in the present case were intended to create a lien upon the ties and the proceeds of sale thereof by express contract.

"A party may, by manifest intent and agreement, create a security, charge or claim in the nature of a lien on real as well as on personal property whereof he is the owner or in possession, which a court of equity will enforce against him, and volunteers or claimants under him with notice of the agreement. . . . If a transaction resolve itself into a security, whatever may be its form, and whatever name the parties may choose to give it, it is in equity, a lien." (17 R. C. L. 604, sec. 13.)

In 37 C. J., p. 315, sec. 19, it is said: "As a general rule any express executory contract in writing, based upon a valuable and adequate consideration, whereby one party clearly indicates an intention to charge or appropriate some particular property, real or personal, therein described or identified, as security for a debt or other obligation, . . . creates an equitable lien upon the property. . . . in the hands, not only of the original contractor, but also of his heirs, personal representatives, assigns, or purchasers or encumbrancers with notice."

Section 28, page 321, of the last-mentioned authority further says: "An equitable lien for advances may exist where advancements of money or funds are made on the faith of certain property, real or personal, under an agreement or circumstances showing that it was the intention of the parties to pledge such property as security for the advancements, provided the specific property or its proceeds on which the advancements were invested can be traced or identified."

The defendant Elich had divested himself of all title to the ties in question by the express provisions of the contracts with the interveners. The deeds of conveyance were sufficient notice that he was not the owner. In the shipment of this particular consignment of ties to the Southern Pacific Company, Elich became a mere agent for the interveners. He shipped them at the written request of Mr. Haight. This vested him with no title to the ties. The attaching creditor could acquire no greater title than Elich possessed. It follows that the findings and judgment of the court, to the effect that Elich was the owner of the ties and the proceeds of sale thereof, are erroneous.

The judgment is reversed.

A petition for a rehearing of this cause was denied by the District Court of Appeal on April 15, 1931.